## PEOPLE *ex rel.* RUSSELL *v.* SUPERVISORS OF HERKIMER.

### N. Y. Supreme Court, Herkimer Special Term; 1886.

*Town; liability for support of indigent lunatics in State asylum.*] Under L. 1874, c. 446, § 16,—which provides that "the expense of sending any lunatic to a State asylum, and of supporting him there, shall be defrayed by the county or town to which he may be chargeable,"—the expense of an indigent lunatic, though not a pauper,

and therefore not previously chargeable to the public, is to be defrayed by the supervisors, and ultimately borne by the town or county where he resides or has a legal settlement.

Mandamus.

On December 15, 1885, an alternative writ of mandamus was issued out of this court on the relation of Samuel T. Russell, as supervisor of the town of German Flatts, in the county of Herkimer, requiring the board of supervisors of said county to reconsider, revoke, and rescind certain action by it taken on December 7, 1885, whereby the expense of maintaining in the lunatic asylums of the State four residents of said town, who had been duly adjudged to be indigent persons, but not paupers, was made chargeable to said town; and further requiring said board to include such expense in the county budget, or to show cause upon a day named why the command of the writ should not be obeyed.

In due time, the board filed its return, whereby, after denying some of the recitals in the writ, and admitting others, it alleged, in substance, that the court had no jurisdiction in the premises; that the relator had an adequate remedy at law; that, by previous payments, without objection, the town was estopped from raising the question, and that the town was by law chargeable with such expense.

The case was tried on August 17, 1886, at chambers, by consent, as of the Herkimer special term, held in June last, and finally submitted for decision upon written briefs on October 27.

*J. B. Rafter*, for the relator.

*Brown & Mitchell*, for the respondent.

VANN, J.—Chapter 446 of the Laws of 1874—known as the Revised Act for the Care and Custody of the Insane—among many other things, provides for the ad-

mission to a State asylum of certain persons, described as indigent, but not paupers, to be there supported at the expense of the public. By section 14 of this act, as amended by chapter 164 of the Laws of 1880, it is provided that when a person in indigent circumstances, not a pauper, becomes insane, the county judge of the county where such person resides shall, when applied to in his behalf, fully investigate two questions: 1st, as to his indigence; and, 2d, as to his insanity. If the facts appearing on such investigation warrant it, the judge thereupon certifies that satisfactory proof has been adduced as to the sanity of such person, and the insufficiency of his estate to support himself and his family while he is under the visitation of insanity. No notice of this investigation is required to be given to any one. Its apparent object is, by a preliminary and *ex parte* inquiry, to ascertain whether there should be a further investigation upon notice to some representative of the public.

The next step is required to be taken upon reasonable notice " to one of the superintendents of the poor of the county chargeable with the expense of supporting such person in a State asylum, if admitted," and the judge, at the time and place designated in the notice, is directed to " proceed to ascertain when such person became insane." The object of this requirement is not apparent from the statute in its present form. Why the important questions as to lunacy and indigence should be investigated and certified to without notice, and the comparatively unimportant question as to the date when the lunacy began should be investigated and certified to only upon notice, is not easily understood. Light is thrown upon the subject, however, by comparing the statute as amended in 1880 with the enactment of 1874, which provided that an order of admission to a State asylum should only be made in case such person became insane within one year prior to the granting of the order. While this part has been omitted by amendment, the former provi-

sion, which was of some importance in connection with it, has been retained.

The closing sentence of the section is as follows: " The judge granting said order of indigence shall file all papers belonging to such proceedings, together with his decision, with the clerk of the county, and report the facts to the supervisors, whose duty it shall be, at their next annual meeting, to raise the money requisite to meet the expenses of support of such indigent lunatic."

The first sentence of section 16 of the same act, which relates to the same subject, is as follows: " The expense of sending any lunatic to a state asylum and of supporting him there shall be defrayed by the county or town to which he may be chargeable."

Section 31 of title 3 of the same act, page 580, provides that the expense of maintaining a patient received in an asylum, " upon the order of any court or officer, shall be paid by the county from which he was sent to the asylum," but it further provides that said county " shall have the right to require any individual, town, city or county that is legally liable for the support of such patient to reimburse the amount of said bills, with interest from the day of paying the same."

While the last section refers in terms to the " State Lunatic Asylum at Utica," subsequent sections make it applicable to the other insane asylums of the State (*Id.* title 4, p. 582, § 7; title 5, p. 583, § 2; title 6, p. 584, § 3; title 7, p. 585, § 3).

Pursuant to said section 14, orders of indigence or admission were made by the county judge of Herkimer county in relation to four residents of the town of German Flatts, who, by virtue thereof, were received into one or more State lunatic asylums, where they were maintained during the year 1885, at an expense, in the aggregate, of $637.28. Said sum was charged to the town of German Flatts by the board of Supervisors, contrary to the protest of the supervisor of that town, who insisted

that it was a county charge. The object of this proceeding is to determine whether said sum is properly chargeable to the town or to the county.

It is not at all surprising that the statute under consideration has been differently construed by the town and county authorities. Some of its provisions are apparently inconsistent, and naturally produce confusion, making the duty of judicial construction difficult but necessary.

What did the legislature mean when it said, in section 14, that it should be the duty of the supervisors, " to raise the money requisite to meet the expenses of support of such indigent lunatic ? " And, in section 16, that " the expense of sending *any* lunatic to a State asylum and of supporting him there, shall be defrayed by the county or town to which he may be chargeable ? " " Any lunatic " obviously refers to " indigent lunatics " as well as others. Both terms are used, not only in the same statute, article and title, but also in the same connection, and in legislating upon the same subject. It follows that some towns are " chargeable " with the expense of supporting indigent lunatics in State asylums.

What towns? The statute says, the town to which the lunatic " may be chargeable." But it is suggested that an indigent lunatic, not a pauper, is not " chargeable" to any town or county, because he has not been supported at public expense. This is true, but by the statute, the public assumes the burden of supporting him temporarily while insane, not exceeding a limited number of years, as if he was a pauper, and it is only a natural use of language to say that the expense shall be borne " by the town or county to which he may be chargeable " as an object of charity ; that is, to the town or county where he resides or has a legal settlement. He is thus made chargeable, as an indigent, to the corporate authority to which he would be chargeable if a pauper, and possibly upon the theory that he would speedily become a pauper and thrown upon the town if not cured of his malady. Is there any good

reason for a distinction as to the liability for the support of the insane poor who are paupers, and the insane poor who are not paupers, so long as both are supported at the expense of the public? The expense of supporting all insane paupers is thrown by law upon the town or county where such paupers have a legal settlement (3 *R. S.* 7 ed. 1913, § 31; *Id.* 1915, § 7; *Id.* 1916, § 2; *Id.* 1917, § 3; *Id.* 1918, § 3).

Why should the town support one class of insane poor and the county another, when both have a legal settlement in the town? Analogy would suggest that the same rule be applied to each, and that if the legislature intended to prescribe a different rule for either, it would do so in plain terms. As for instance, the original act upon which the statute under consideration is based, and of which, in many respects, it is a substantial copy, provided by section 26, corresponding to section 14 of the present act, that upon the order of admission made by the county judge, the person " in indigent circumstances, not a pauper," should " be admitted into the asylum and supported there at the expense of the county, until restored to soundness of mind, if effected in two years (*L.* 1842, c. 135, § 26).

Under this act it was held, in People *v.* Supervisors of Genesee (7 *Hill,* 171), that the support of a person admitted to an asylum under said section was a county charge, the court in its opinion quoting and underscoring the above words: " at the expense of the county."

It is significant that the legislature, in revising this act in 1874 (c. 446, § 14), not only omitted these words entirely, but enacted that the expense of supporting " *any* lunatic" at a State asylum should be defrayed by the county *or town*, etc. (*Id.* § 16). This change in language indicates a change in intention and policy on the part of the legislature, especially since the decision in 7 *Hill* (above) had been published in a well-known volume of

law reports for thirty years at the time that the revision was made.

In making the revision, there was also omitted an-. other provision, contained in the act of 1842, which limited orders admitting the indigent insane, not paupers, to a State asylum to such persons as had not been insane longer than one year. Apparently, the legislature made an experiment in 1842 by providing, at the expense of the public, scientific treatment in an improved insane asylum for poor people who were able to support themselves when sane, but who were not able to do so when insane, or to pay for such care as would be most apt to effect a cure. The experiment was limited to persons recently becoming insane, and their stay in the institution at the public expense was not to exceed two years. After the experiment had been in operation for many years, the legislature, in re-enacting the statute, omitted the limitation as to persons who had become insane within one year, so that it now applies to any insane person, regardless of the length of time that he may have been insane. Is it not probable that the law-making power,—when, satisfied with the result of its experiment, it extended its aid to all the indigent, omitting the provision that their support should be at the expense of the county and inserting the provision that their support should be met by the town or county chargeable,—intended to place the burden of aiding the "indigent" upon the same body politic upon which it had already placed the burden of aiding the destitute? When thus construed, the statute no longer appears inconsistent.

Section 14 provides the method of paying the asylum authorities, without, in its present form, determining the body that is ultimately liable. That is done by section 16, while the method of the reimbursement is prescribed by section 31 (art. 3, title 3). The supervisors raise the money in the first instance to pay the different asylums, just as they are required to do in the case of insane paupers,

but the expense is ultimately defrayed by the town or county chargeable, which is also the case with insane paupers, and the support of the indigent insane and the pauper insane is thus placed on the same basis. In this way, the managers of the asylums are relieved of embarrassment in the case of a contest between the town and county as to where the patient has a legal settlement. They are not compelled to wait for their pay until such questions are settled.

Against this construction, which, after careful study of the subject, I have adopted, it may be urged that, if the county is not alone liable, why does section 14 require notice to be given to the county superintendent of the poor, exclusively, instead of to the overseers of the poor in those cases where the support is claimed to be a town charge?

The county superintendent represents not only the county at large, but also every town in the county. His duties are largely of a judicial character. He is not required to protect the interests of the county as against the towns any more than the interests of the towns as against the county. He is required to see that each has its rights, and to settle, upon evidence, by judicial determination, various conflicts of interest between the different towns as well as between the county and any town (3 *R. S.* 7 ed. 1860, §§ 33, 35; *Id.* 1861, § 38; *Id.* 1862, § 45; *Id.* 1866, § 60). He has power to decide where the legal settlement of a pauper is, whether the question arises between two towns or between county and town (*Id.*). Service of notice upon such an officer is not inconsistent with the construction already indicated.

It is unnecessary to consider the questions relating to the remedy, which have been argued so fully by counsel, as it follows from what has been said, that the writ should be dismissed with costs.

Findings may be prepared and judgment entered accordingly.